## Case No. 8,596.

### The LUCY ANNE.

[3 Ware, 253;[1] 23 Law Rep. 545.]

District Court, D. Maine. March, 1860.

BOUNTY — COD FISHERY — SEAMEN'S WAGES—ACCOUNT OF FISH TAKEN—CUSTOM—AGREEMENTS BETWEEN OWNERS AND SEAMEN.

1. A court of admiralty has jurisdiction to de- cree the bounty allowed to persons employed in the cod fishery, and a claim for this may be united with a claim for an account of the fish taken during the voyages.

[Cited in The Grace Darling, Case No. 5,651.]

2. A custom is obligatory on the parties only when the law does not provide for the case.

3. When a condition precedent is annexed to a gift, that cannot be repudiated and the gratuity received unconditionally.

4. The reasonableness and equity of an agree- ment between owners and seamen will always be examined by a court of admiralty.

This case originated in the following state of facts. The complainant, Philip Rines, a minor, had been engaged in the service of the schooner Lucy Anne, of Southport, district of Wiscasset, during the cod-fishing season of 1859. The season embraced two voyages, one in hand-line fishing, the other in a troll- ing voyage. After the completion of the sec- ond voyage, Rines left with the master's con- sent, who did not settle up his wages. The terms of service and compensation were em- braced in the articles of agreement, usual in this district. the substance of which is given in the opinion of the court. After the sale of the fish, the master, being at Wiscasset (the residence of Rines), called him aside and ex- hibited an account made up of various items of charges for supplies, outfits, and deduc- tions for absence, extra help, etc., absorbing, or nearly absorbing, all his earnings from his catch of fish. No allowance of his share of five-eighths of the bounty was reckoned into the proceeds of the voyage. The father there- upon founded a libel on the facts, which was filed, and process issued against the vessel, which was duly arrested, and in the course of the trial the rights of fishermen, in the premises, to a full and just account of the fish taken, and to the entire value of the same. and to each man's share of five-eighths of the allowance of bounty received by the owners of the vessel, came up for settlement and adjudication on the principles of law and equity, as administered in courts of admiralty and maritime jurisdiction.

Sewall & Willis, for libellant.

Shepley & Dana, for respondents.

WARE, District Judge. This libel is filed by Philip Rines, a minor, by his father, and next friend, against the fishing schooner Lucy Anne. of about thirty-one tons burthen. claim- ing his share of the bounty, and an account of the fish taken in two trips in the season of 1859. No question has been made as to his engagement, or the time of his service. The defence relied on is, first, that he has been fully paid, for which his owners have his receipt; and, secondly, misbehavior, negli- gence. and desertion. during the voyage. But a question, in its nature preliminary, is made, that a court of admiralty has no jurisdiction over the question of bounty, and that this can be recovered only in a suit at common law. The provision of the law is, that there shall be paid to every vessel of thirty tons burthen. and over, at the rate of four dollars a ton, that shall be engaged in the cod fishery during the season. three-eighths of which shall belong to the owner, "and the other five- eighths thereof shall be divided by him, or his agent, to and among the several fishermen who shall have been employed in such vessel during the season aforesaid, or part thereof, as the case may be, in such proportions as the fish they shall have respectively taken bears to the whole quantity of fish taken on board such vessel during such season." The con- sideration of this allowance is essentially and exclusively maritime. It is measured to the men in proportion to the fish they have taken, and must be considered like the double pay allowed to seamen when they are put on short allowance, and the three months' pay allowed when discharged in a foreign port, as additional wages. It is a gratuity offered to the men to engage in this laborious, and not usually lucrative service, forming a nurs- ery and school for seamen, who are always ready to engage in the public service when they are wanted. The law does not, indeed, say that they may recover it in a libel as wages; but it treats them as seamen, giving the same remedies against them for enforcing their contract, and subjecting them to the same penalties. The allowance is paid to the owner, and he is bound to pay it over to the men. I can see no room for doubt that a claim for the bounty, and for an account of the fish taken in the voyage. may be united in the same libel. They relate to the same subject-matter. and if the bounty is to be con- sidered an additional compensation, are both of admiralty jurisdiction.

The first objection to the libel. on its merits, is the settlement made in January, and the receipt in full of Philip of that date. This settlement was on the basis of the custom of Southport, and assumes the validity of that custom. Waiving the question of the reason- ableness of that settlement,—and as it depart- ed from the law, whether it was explained to the libellant. and fully understood by him; whether he gave up any of his legal rights without receiving a full consideration there- for, which as a fisherman having the rights of a seaman, a court of admiralty will always look into;—setting aside these questions, it is manifest that the case brings up the binding force of that custom. The settlement refers to this. and this has been the principal ques- tion which has been argued. It is, in fact, to settle this question that the suit is prose- cuted, for the amount in controversy would

[1] [Reported by George F. Emery, Esq.]

be scarcely worth the expense of litigation unless this question lay at its bottom. But this is important, both as a legal question and in its practical consequences, and deserves a deliberate consideration. Custom certainly may have the force of law, and be equally binding, when it is not expressly referred to in the contract. In all civilized and uncivilized countries a large portion of the transactions between man and man is left to be regulated by usage. And this usage is binding on the parties because they make their engagements in reference to it, and it comes in and silently makes part of the contract. This is the case when no reference is made to the custom; and it is still more so when the parties themselves refer to it. But this is only also when the legislature has not expressed its will on the subject, or when, as is not uncommon, the general rule is established, that the parties are expressly allowed to derogate from the law by their particular contracts. But when a departure from the rule of law is not expressly or impliedly allowed, the law prevails; and this for the best reason, because every party is supposed to know the law and make this a part of his contract, unless he expressly provides otherwise. Seamen, however, have at all times, from their habitual carelessness and improvidence, from their own ignorance and the superior knowledge and the habits of business of those who deal with them, been held to be peculiarly entitled to the protection of courts of justice. They have been treated in some manner as minors, incapable of waiving their legal rights without these are fully explained at the time, and a full and adequate consideration is made for them. If the case rested here a duty might be imposed on this court to see that a full equivalent for the bounty was allowed by the custom of Southport.

But the question in this case is not merely whether custom can do away with an express provision of a statute, but whether a grant of the legislature, supported by a consideration can be abrogated by a custom. This grant of a bounty is made only to vessels qualified by law to carry on the cod fisheries. The United States alone can give that qualification, and this would be a sufficient consideration to uphold a contract in any case. The ship cannot receive the bounty without the requisite qualification. This, then, is a gratuity to the vessel, and it is given on the express condition that five-eighths shall go to the fishermen, and to this extent it is a gratuity to them, and it is given them on condition that they inure themselves to this hardy service. If they should choose to waive their rights, they could not do it without the consent of the United States. The donor may annex such conditions to his bounty as he pleases; nor at least when he has an interest in his liberality, can the beneficiary repudiate the conditions without the consent of the donor. He cannot take that as a free gift to which a condition precedent is annexed.

Independent of the last clause of the contract, by which the parties reserve to themselves all the benefits to which they are entitled under the act for the government of persons employed in the fisheries, I can entertain no doubt that the custom is void. Besides, so long had the practice prevailed in this district of settling with the fishermen without paying to them any part of the bounty, that from the whole evidence it is evident that they were uncertain whether any part was due to them. The libellant would be entitled to relief on common principles, taking into view his occupation, on the ground of a surprise. There must be a decree for the bounty. Whether the custom of Southport is a beneficial one or not, is a question into which the court cannot examine. The United States have a perfect right to affix such conditions to their gratuities as they please.

The next question is, to what part of the bounty is Rines entitled? Five-eighths is to be distributed among the men, respectively, in the proportion which the number of fish taken by each bears to the whole taken on board the vessel. In the first trip there is no controversy. The fish were taken with lines, and the fish of each man were put into a kid by themselves, and faithfully counted out at night. The entry of them at each night was made on a slate in the presence of the whole crew, so that every man had an opportunity to see that his fish were rightly counted; and the week's work was on Saturday night transferred to a book in ink. This I think a sufficient entry. In this trip, according to the account, Rines took 1,337 fish. In the second trip the fish were taken by a troll. This is a new mode of fishing, with which all the men were equally inexperienced. A troll, as described by the witnesses, is a long rope extended on the water for many fathoms, with baited hooks attached to it, about three or four feet apart. This is sunk in the water and occasionally drawn up with the fish on the hooks. The whole crew is employed in the management of the troll, and the fish come up in a mass. Though the troll shows what the whole have taken, the share of each individual cannot appear in this mode of fishing. But the law requires the bounty to be distributed among the crew in proportion to the amount taken by each individual. When a part of the time is spent in troll fishing, and a part in taking with lines, I know of no more equitable way of dividing the troll than to allow to each man a proportion equal to that which he has taken with the line. This may be considered as indicating a fair average of the efficiency of each man. The whole number of fish taken on the first trip with lines was 7,958, of which, Rines took 1,337. That taken by troll fishing was 4,000. This would make Rines' share 670, and added to 1,337 will make 2,007. His share of the bounty will be $13.06.

The libellant also demands his share of the fish. I know of no reason for doubting the account of John Cameron of the proceeds of the sale of the fish, and that the proper deductions were made of salt, the expenses of cure, freight, and commissions. According to this account, the net proceeds of the sale of the fishermen's part were $464.35. Of this, Rines' share was $78.93, and to this add his share of the bounty, $13.06, and we have $91.99 as the balance due from the owners. Against this demand, the owners have filed their account of offsets of $70.38. This libel is brought by Philip, a minor, by his father and next friend, and there can be received in offset only what went to Philip, or what he authorized to be charged against him. What was for Moses Rines, the father, cannot be charged against Philip. It is true that the father might appropriate the earnings of his son to himself. He might also leave the earnings of the child to him, and the son's bringing the libel himself, with the authority of the father, must be considered as a sufficient proof of emancipation. We may strike out the charge in Lincoln's bill of $9.23. With respect to Lenox's, though I think that there is some doubt as to part of the charge, my opinion is that, as Philip gave his order for the payment, it ought to be allowed. There is a charge of six days' work on board the vessel in Rines' absence. According to the custom under which the contract was made, certain duties on board the vessel were to be performed by the men. But of such a charge as this there ought to be some better evidence than a simple charge in a pencil account, or the testimony of a witness. The absence of a seaman should be noted in the log-book at the time, both to show that there was a delinquency on the part of the seaman, and that it was such a one as in the opinion of the master or skipper ought to be noticed. Independent of this, Russel was from the same town, and was absent at the same time, and about the same number of days with Philip; he was charged with but one day's labor for his absence. As he was one of the crew, and had the same labors to perform, if I allow against Philip the same, I think enough will be allowed. Decree for $20.51, and costs.